**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Isaac E. MARSHALL, Defendant–**
**Appellant.**

**No. 96–3529.**

United States Court of Appeals,
Seventh Circuit.

Argued June 5, 1998.

Decided Sept. 8, 1998.

---

Randy G. Massey (argued), Office of the United States Attorney, Fairview Heights, IL, for Plaintiff–Appellee.

Eric M. Schwing (argued), Babette P. Salus, Schwing & Salus, Springfield, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and BAUER and KANNE, Circuit Judges.

BAUER, Circuit Judge.

Appellant Isaac Marshall was charged with, and convicted of, conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 846. The district court sentenced Marshall to 300 months' imprisonment, imposed a $50 special assessment and $4,000 fine, and placed Marshall on five years of supervised release. Marshall now appeals both his conviction and sentence, asserting that the district court erroneously denied his motion to suppress certain evidence, that the prosecution knowingly used false evidence at trial, and that the district court incorrectly determined his sentence. Finding no errors with the district court's judgment, we affirm.

## BACKGROUND

On March 18, 1993, officers from several law enforcement groups, including the St. Louis police department, set up surveillance of defendant Isaac Marshall's ("Marshall") house at 3442 Itaska in St. Louis. The purpose of this surveillance was to keep an eye on Marshall's house, which the police had reason to believe was the site of methamphetamine-related activities, while Detectives Thomas Murphy ("Murphy") and Emmett Gelhot ("Gelhot") prepared an affidavit for a search warrant of the premises. While on surveillance, officers saw Terry Marshall, Marshall's son, exit the house and walk towards a white Cadillac with a gym bag. Terry removed a jacket from the bag, which he placed in the trunk of the car, and went back into Marshall's house. Several minutes

later, Terry and another man, Dennis Best, again left Marshall's house. Terry removed the bag from the trunk and placed it in the passenger side of the rear seat of the Cadillac; he then got in the car while Best entered a nearby Blazer. Both men drove off with the police on their trails, while some of the officers remained behind to continue watching Marshall's house.

The police pulled over Terry Marshall several blocks from Marshall's house. When an officer approached the vehicle, he spotted three bags of white powder inside the partially-open gym bag. Terry was arrested, and a further search of the bag revealed some clothes and $15,500 in cash. After being advised of his constitutional rights, Terry informed the officers that the drugs and money were his father's and that his father was expecting him to return to the house shortly. Officers following the Blazer saw Best throw several items out of the window as he was traveling, and eventually he was arrested as well.

After hearing of all this activity, Murphy and Gelhot decided to temporarily abandon their efforts and secure Marshall's house before obtaining the warrant. *See* Tr. of Suppression Hearing at 30. At some point, the officers remaining by Marshall's house saw a man and woman leave the house and enter a vehicle. When officers approached the car and asked the individuals to get out, the woman dropped a leather cigarette case on the front seat as she exited the car. A subsequent search of the case revealed one large and two small bags of a whitish powder.

When Officers Murphy and Gelhot arrived at Marshall's house, they, along with Terry Marshall, who was needed to subdue some dogs, went through the back yard of Marshall's house and into the basement, where Marshall was living. As they entered, they passed through a laundry room into another part of the basement, where they saw Marshall talking on the telephone while holding a clear plastic bag containing what appeared to be methamphetamine. When Marshall saw the officers, he placed the bag in a coffee can on a table. The officers also found Michael Marshall, another of Marshall's sons, asleep on a bed in the basement. The officers advised Marshall that they were there to secure the residence and that they would return later with a search warrant. Marshall indicated that he did not want the police to disturb his mother, who lived upstairs, and he consented to a search of the basement. Marshall also made several other inculpatory statements at that time, and a search of the basement revealed more suspected methamphetamine, some drug paraphernalia, and $646 in currency. Marshall was arrested and taken to the police station, where he made a written statement indicating that he was involved in the trafficking of methamphetamine.

Marshall, along with his sons and a number of other individuals, was indicted on January 20, 1995, and charged with conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Prior to trial, Marshall filed a motion to suppress the evidence seized from his home, arguing that the police had illegally entered his residence without a warrant and had conducted an illegal search. The district court denied this motion, and Marshall went to trial. He was convicted of the charge against him, and was sentenced to 300 months' imprisonment on October 7, 1996. Marshall filed a timely notice of appeal, and presently argues that the district court erred in denying his motion to suppress and that his sentence is based on erroneous findings of fact. We examine each of Marshall's arguments in turn.

## ANALYSIS

### 1. Motion to Suppress

 Marshall first argues that the district court erred in denying his motion to suppress certain evidence. In reviewing a district court's ruling on a motion to suppress, we review questions of law *de novo* and questions of fact for clear error. *United States v. Gravens*, 129 F.3d 974, 978 (7th Cir.1997), *cert. denied*, — U.S. —, 118 S.Ct. 1333, 140 L.Ed.2d 494 (1998) (citing *United States v. Liss*, 103 F.3d 617, 620 (7th Cir.1997)). A factual finding is clearly erroneous "when, although there is evidence to support it, the reviewing court is left with the

definite and firm conviction that a mistake has been made." *Id.* Since the resolution of a motion to suppress is fact-specific, we accord special deference to the district court, which heard the testimony and observed the witnesses at the suppression hearing. *Id.* (citing *United States v. Stribling,* 94 F.3d 321, 323 (7th Cir.1996)).

Marshall first contends that the officers' entrance into his home without a warrant violated his Fourth Amendment rights and that the evidence they collected was tainted. The district court ruled as follows with respect to this argument:

> The sequence of events that we have just heard was that there was a surveillance of the defendant's residence in the city of St. Louis because the police had been advised that there was some methamphetamine or it was coming in from California.... [D]uring the course of that surveillance the defendant's son, Terry Marshall, was observed to leave the house with a bag, gym bag, which he placed in the trunk of his car, took out a jacket, put it on him and went back in the house. Shortly he returned with someone else, then went to get the bag out of the trunk and put it under the passenger side of his Cadillac, and the other individual, I believe it was a Bronco—In any event, the two of them drove off. They were followed by police officers and one—the two car's paths' (sic) digressed. The police broke up their chase, or not a chase, but their following of the two cars and one group followed one and one the other and eventually Terry Marshall was pulled over, apprehended, and found to have a substantial amount of a white powdery substance suspected to be methamphetamine together with a large amount of currency and he, in fact, in effect, informed the officers that his father was at the residence and that his place of operation was the basement of the residence. While this was going on, officers were attempting to obtain a search warrant in that they were in the process of preparing an affidavit for it. In the meantime, another pair of individuals were observed, a man and woman leaving the same building, and they were stopped and it was found that there was methamphetamine or at least a white powdery substance suspected of being methamphetamine in a leather cigarette case, which the female had and which she dropped upon getting out of her car. When Terry Marshall was apprehended, he told the officers that his father expected him to return momentarily for—I don't know if the reason was given. We were not told about it. But in any event, young Marshall was expected back at any moment. All of these events, the people, two sets of people leaving the residence and being found with amphetamine, the statement by Terry Marshall that he was expected to return promptly to the residence and perhaps should have already been back there, the fact that he stated that his father was at the residence, the further fact that the officers had a fear that because of all of the activity outside of the residence that their surveillance, and thus their investigation may have been compromised, and coupled with the further fact that any narcotic substance, or at least any methamphetamine, could be easily destroyed, I believe shows that the police officers acted as soon as they reasonably could have been expected to act under the circumstances to obtain a warrant. I further find that their acts were objectively reasonable, and under those circumstances that they had good reason to believe that there were exigent circumstances which required a search, an entry to secure the premises pending the obtaining of a warrant.

*See* Tr. of Suppression Hearing at 56–58. Our review of the record shows that the factual findings set forth by the court are supported by the evidence and are not clearly erroneous. Thus, we only consider whether the court's determination that these facts constituted exigent circumstances was correct.

It is well-settled that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Such searches and seizures are permitted, however, when probable cause and exigent circumstances exist. *Welsh v. Wisconsin,* 466 U.S. 740, 749, 104

S.Ct. 2091, 80 L.Ed.2d 732 (1984) (citing *Payton*, 445 U.S. at 583–90, 100 S.Ct. 1371). Exigent circumstances exist when there is a compelling need for official action and no time to secure a warrant. *United States v. Saadeh*, 61 F.3d 510, 516 (7th Cir.), *cert. denied*, 516 U.S. 990, 116 S.Ct. 521, 133 L.Ed.2d 428 (1995) (citing *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978)). It is the government's burden to prove that its agents had an objectively reasonable belief that exigent circumstances existed at the time of the warrantless entry into the defendant's premises. *United States v. Robles*, 37 F.3d 1260, 1263 (7th Cir.1994). When determining whether exigent circumstances exist, the court must analyze the situation from the perspective of the officers at the scene. Accordingly, we ask not what the police *could* have done but rather whether they had, at the time, a reasonable belief that there was a compelling need to act and no time to procure a search warrant. *Saadeh*, 61 F.3d at 516 (citing *United States v. Foxworth*, 8 F.3d 540, 544 (7th Cir.1993), *cert. denied*, 511 U.S. 1025, 114 S.Ct. 1414, 128 L.Ed.2d 85 (1994)); *Robles*, 37 F.3d at 1263. In this case, we find that the district court properly determined that such a reasonable belief existed on the part of the officers.

▪ Exigent circumstances have been found to exist when "the police have an objective and reasonable fear that evidence is about to be destroyed." *United States v. Napue*, 834 F.2d 1311, 1326 (7th Cir.1987); *see also Schmerber v. California*, 384 U.S. 757, 770–71, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (exigent circumstances existed where delay necessary to obtain a warrant threatened the destruction of evidence). In such a situation, "we ask whether 'the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.'" *United States v. de Soto*, 885 F.2d 354, 367 (7th Cir.1989) (quoting *United States v. Rivera*, 825 F.2d 152, 156 (7th Cir.1987), *cert. denied*, 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987)). Looking at the totality of the circumstances in this case, we agree with the district court that exigent circumstances existed. First, we note that there was ample probable cause present in this case. The police had been told by an informant that Marshall was in possession of methamphetamine on the day he was arrested. *See* Tr. of Suppression Hearing at 23–24. In addition, several people who had been seen leaving Marshall's house had methamphetamine in their possession when they were arrested. *Id.* at 25–28. This information was sufficient to give the police probable cause that Marshall was indeed in possession of illegal drugs at the time they decided to enter his house.

The evidence shows that the police had an objectively reasonable basis, from the totality of the circumstances, to believe that exigent circumstances existed which required their warrantless entry into Marshall's house. The police had information from an informant that Marshall was in possession of a sizable quantity of methamphetamine at his home and began surveillance of it at around 5:30 or 5:45 p.m. At around 6:00, Marshall's son Terry, who was stopped after leaving Marshall's home, was found to be in possession of methamphetamine and a large amount of currency. *See* Tr. of Suppression Hearing at 26. At some point, Terry Marshall informed the officers that his father was at home and was expecting him to return shortly. *Id.* at 29. Almost contemporaneously, the police also were following another vehicle containing a man who had just left Marshall's house; the person in this vehicle was attempting to discard items as they drove along. *Id.* at 27. Also about this time, two people were arrested in close proximity to Marshall's house (and after just leaving it), and were found to be in possession of what appeared to be methamphetamine contained in a leather cigarette case. *Id.* at 18–19. Because of this activity occurring almost immediately outside of the house, and because Terry Marshall indicated that he was due back, the officers could reasonably have determined that Marshall was aware of their activities and was preparing to destroy evidence inside his house or that he would continue to sell methamphetamine during the time that it took them to get a search warrant.

In addition, there was no time for the officers to obtain a search warrant before entering Marshall's home. The evidence showed that this was a local investigation, not a federal investigation, and that the state of Missouri does not allow telephonic warrants to be issued (as the federal government does). Seeking a warrant outside of regular business hours in Missouri, as was the case here, is a timely process which involves locating a Circuit Attorney to review the application materials and going to a judge's home to have the warrant issued. *See* Tr. of Suppression Hearing at 27–28. It was while the officers were starting this warrant application process that the events took place near Marshall's home, and they reasonably determined that they had no time to finish the process before securing Marshall's home.

■ Marshall argues that the police had sufficient information to procure a warrant before the night in question and that their delay in procuring a warrant cannot create exigent circumstances. Citing *United States v. Rosselli*, 506 F.2d 627, 630 (7th Cir.1974), Marshall suggests that we must "appraise the agents' conduct during the entire period after they had a right to obtain a warrant and not merely from the moment when they knocked at the front door." *See* Appellant's Brief at 11. The facts of *Rosselli* are distinguishable from the present case. In *Rosselli*, the police made no attempt to obtain a search warrant before proceeding to the defendant's apartment; in this case, a warrant application was being completed when the exigent circumstances arose.

Moreover, the police need not apply for a warrant as soon as they have any incriminating evidence on a suspect; it is not unreasonable for them to initiate surveillance on the suspect to corroborate the information they already have on hand. Furthermore, the officers in this case set up the surveillance of Marshall's house while others worked on the warrant application because they had received information that Marshall was then currently in possession of methamphetamine. All of the actions taken by the police were reasonable, and the circumstances that arose while they were preparing the warrant application dictated that a quick

response was necessary and that no warrant could first be obtained.

Marshall cites a number of other cases in support of his argument that no exigent circumstances were present in this case. None of the cases are analogous to the present situation and they do not merit individual discussion. We do note that it is true, as Marshall says, that an arrest on the street does not create an exigent circumstance which allows the police to conduct a warrantless search of the arrestee's house. *Vale v. Louisiana*, 399 U.S. 30, 35, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). However, that is not the case with which we are presented; the arrests of other individuals, not Marshall, prompted the officers to act to secure Marshall's house. In summary, we find that the police reasonably believed that exigent circumstances were present in this case and that the district court's determination that their warrantless entry into Marshall's home was not illegal is correct.

■ Marshall next contends that the officers' warrantless search of his home (apart from their warrantless entry into his house) renders the evidence they discovered inadmissible. The Fourth Amendment's prohibition against warrantless searches does not apply to situations in which voluntary consent to search has been given. *S.L. v. Whitburn*, 67 F.3d 1299, 1307 (7th Cir.1995) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). Such consent, however, must have been given "freely and voluntarily." *United States v. Rice*, 995 F.2d 719, 723 (7th Cir.1993). Whether consent was voluntary, as opposed to being a product of duress or coercion, is a question of fact to be determined by the totality of the circumstances. *Id.* We will reverse the district court's determination of voluntariness only if it is clearly erroneous. *Saadeh*, 61 F.3d at 518. The district court found that Marshall's consent was knowingly and voluntarily given and was not the result of coercion or pressure; we agree.

■ At the suppression hearing, the government introduced into evidence a form entitled "Consent to Search and Seize." This form listed Marshall's address, specifying

that the basement would be searched, and was signed by Marshall. *See* Rec. Doc. 490, Gov. Exh. 1. By signing the form, Marshall attested that he was giving the officers permission to search "voluntarily and without threats, or promises of any kind." *Id.* Detective Gelhot testified that the officers told Marshall, upon entering his house, that they were present to secure his house and that some of the officers would return to the police station to prepare search warrant documents and return at a later date to search his home. Marshall told the officers that a warrant was unnecessary because they had already found his drugs. *See* Tr. of Suppression Hearing at 46. Detective Murphy testified that Marshall did not want the police to disturb his mother, who lived upstairs, by returning with a warrant, and that he verbally gave the officers consent to search. Marshall thereafter completed the written consent form in the presence of Detectives Gelhot and Murphy and their supervisor, Detective Sergeant Leman Dobbins. *Id.* at 34–35. There was neither evidence that the police pressured or forced Marshall to sign the consent, nor evidence that Marshall did not understand what the detectives were seeking to do.

While Marshall cites a number of cases holding that there must be a break in the causal chain between an illegal seizure (or entrance to a home) and the consent in order for that consent to be voluntary, those cases are inapplicable here because we have found that the entry into Marshall's home was pursuant to exigent circumstances (and, thus, legal). Given the evidence presented at the suppression hearing and the lack of any evidence showing that Marshall was forced to give his consent, the district court's finding that Marshall's consent was voluntary is not clearly erroneous.

### 2. Prosecution's Use of False Evidence

 Marshall next asserts that his conviction must be overturned because it was obtained through the prosecution's knowing use of false evidence. At trial, the government introduced a written statement made by Marshall at the time of his arrest. In this statement, Marshall admitted that he had purchased three pounds of methamphetamine the previous week and that all of the drugs seized by the police on March 18 were "mind & mind alone (sic)." *See* Appellee's Brief, App. J. Marshall asserts that this statement was false, and that the government knew it was false, because three of the government's own witnesses testified that the methamphetamine actually belonged to Terry Marshall, not his father. This argument is without merit and requires little discussion. The fact that the confession was countered by conflicting evidence does not mean that it was "false." Were we to find that it was, the prosecution would be guilty of using false evidence every time there was conflicting evidence on any point, an absurd and illogical result. The differing evidence concerning who owned the drugs seized by the police was simply an issue of fact for the jury to decide and did not constitute the knowing use of false evidence by the prosecution.

### 3. Sentencing Error

 Finally, Marshall asserts that the district court erroneously determined the amount of methamphetamine attributable to him for sentencing purposes. The district court found that more than three kilograms of actual methamphetamine was attributable to Marshall, thus setting his base offense level at 38 pursuant to United States Sentencing Guideline § 2D1.1(a)(3). We review a district court's findings of fact during sentencing for clear error. *United States v. Purchess*, 107 F.3d 1261, 1265 (7th Cir.1997). This includes the court's calculation of the quantity of drugs attributable to the defendant for sentencing purposes. *United States v. Townsend*, 73 F.3d 747, 751 (7th Cir.1996).

 Marshall claims that three errors were committed by the district court. The government argues that Marshall waived these arguments by failing to raise them in the district court; because they fail on their merits, we need not address this possibility. First, Marshall claims that the district court impermissibly engaged in double-counting of certain amounts of methamphetamine. The pre-sentence report (PSR) on which the district court relied shows that Marshall's argument is incorrect. The amounts that were allegedly double-counted were not included in the report's conclusion that more than three kilograms of methamphetamine was attributable to Marshall. Paragraph 18 of the

PSR states that the total of 3.035 kilograms attributable to Marshall "is conservative because it DOES NOT include the following relevant conduct," and all of the alleged errors cited by Marshall are contained within paragraph 18's scope. Additionally, the court referred to these amounts only after it had already found that Marshall had been involved with more than three kilograms and did not consider the contested amounts in reaching its total. *See* Tr. of Sentencing Hearing at 9–10. There was thus no double-counting by the district court, and Marshall's argument is without merit.

Marshall also alleges that the district court erred in determining that he received 284 ounces of methamphetamine from Timothy Lane. At the sentencing hearing, however, the district court clearly noted that it was attributing more than three kilograms of methamphetamine to Marshall before considering these shipments from Lane (*see* Tr. of Sentencing Hearing at 9), and its consideration of these amounts was not clear error. Finally, Marshall objects to the district court's finding that he received approximately 26 ounces of 94% pure methamphetamine from his son Michael, arguing that Michael's testimony established that he always cut his supply before distributing it to others. Our review of the trial testimony, however, shows that even if this were true, the district court committed no clear error in determining that more than three kilograms of methamphetamine was attributable to Marshall. For example, the district court applied a very conservative estimate of 25% purity to a 12 pound (approximately 5,500 gram) shipment that Marshall drove from California to Missouri, finding that the total amount of methamphetamine attributable to Marshall from this batch was 1,417.5 grams. *See* Tr. of Sentencing Hearing at 8. At trial, the lowest purity of any of the methamphetamine found in Marshall's possession was 38%; applying this higher figure to the 12 pound shipment would more than cover the deficiency alleged by Marshall. Accordingly, we find that the district court did not commit any clear error

in determining that Marshall had handled more than three kilograms of methamphetamine, and his sentence must stand.

## CONCLUSION

The district court did not err in denying Marshall's motion to suppress certain evidence, and Marshall's argument that the prosecution knowingly used false information to obtain his conviction is meritless. In addition, the district court did not commit any errors in determining the quantity of drugs attributable to Marshall for sentencing purposes. Therefore, we AFFIRM Marshall's conviction and sentence.