MAX N. TOBIAS, JR., Judge.
 

 | [The defendant/appellant, Randolph Robinson (“Robinson”), was charged by a grand jury indictment on 5 May 2005 with second degree murder, a violation of La. R.S. 14:30. 1. Robinson pleaded not guilty at his 10 May 2005 arraignment. The trial court denied his motion to suppress the identification on 11 April 2007 and his motion to suppress the evidence on 13 September 2007. Robinson was tried by a twelve-person jury on 23-24 January 2008 and found guilty as charged. On 15 February 2008, the trial court denied Robinson’s motions for new trial and post-verdict judgment of acquittal. On that same date he waived all delays and was sentenced to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. Robinson filed a motion for appeal on 15 February 2008, on which date it was granted.
 

 FACTS
 

 Robinson was convicted of second degree murder for the 29 July 2004 shooting death of Tasha Smith (“Tasha”),
 
 [1]
 
 the victim.
 

 Travis Smith (“Travis”), brother of the victim, testified that Tasha was born on 17 December 1982. He stated on cross examination that he was not at home on |229 July 2004, but had been there on Wednesday the 28 July 2004. On that date he did not hear any shots and did not look outside on the grounds for any cartridge casings of any kind.
 

 Mary Rounds (“Rounds”) testified that in July 2004 she was employed by the United States Postal Service. She stated that Cambronne Street in New Orleans was part of her route and she was working on 29 July 2004. She confirmed that the address of 2514 Cambronne Street was a home to which she regularly delivered mail. Rounds did not remember anybody being on the front porch of 2514 Cam-bronne Street when she delivered mail there on 29 July 2004. When Rounds left 2514 Cambronne Street she encountered the victim Tasha. They talked for perhaps ten minutes. They discussed hair. Rounds also told Tasha she was not allowed to give her postal-issued defensive pepper spray (intended to deter dogs) to anyone. After the conversation Tasha went home. Rounds told her before she left that she was going to come down and talk to her some more. Rounds walked off, with her back toward Tasha. Rounds’ sister telephoned her on her cell phone. Seconds later Rounds heard Tasha scream, and she turned around to see a man standing over Tasha shooting, although she said she could not see Tasha. Rounds could see a gun; she stated that she knew nothing about guns and could not say whether the gun was a revolver or a semi-automatic. She was certain she heard five shots because she recalled thinking to herself that there was one bullet remaining, and that she’d better get out of there. She ran and returned to the post office. She said she also went to the doctor that day because the events had been a lot for her to deal with, and because she had hit her knee getting into the postal vehicle.
 

 | ^During direct examination of Rounds the prosecutor walked away from the witness, telling her to say “stop” when the
 
 *616
 
 prosecutor reached the point at the distance Rounds was from the person who shot Tasha. The prosecutor noted for the record that the distance was approximately 30 feet. On 9 August 2004, Rounds selected Robinson’s photograph from a photographic lineup, writing “Tentative” on the back of it. She explained that she had not been “100 percent sure” of her identification of Robinson. She said that what she observed that day probably lasted “not a minute.” She said it was in the morning and that it had been a bright day. Rounds stated she thought she had seen the shooter once before.
 

 Rounds testified on cross examination that she did not remember how sure she was of her identification of Robinson in the photographic lineup, in terms of percentage, but had seen Robinson before at a different home on Tasha’s block of Cam-bronne Street, perhaps a couple of weeks or a month before. Rounds replied in the affirmative when asked if she was prepared to say that she could not make a positive identification. She could not deny that she told police she was 70% to 80% percent certain. Rounds then replied in the affirmative when defense counsel asked if she was in fact 70% to 80% certain that Robinson was the shooter. She denied that she told the officer that showed her the photographic line up that all the photos in the lineup looked similar. Rounds confirmed that she was so distraught that she had to be transferred out of the area, and she conceded that that was the condition in which she tentatively identified defendant. She said that after the shooting the assailant ran towards the left, as one faced the house at 2514 Cam-bronne Street.
 

 Tony Smith (“Tony”) testified that he was the victim’s twin brother. He testified that at the time of the shooting he was asleep inside of the shotgun double 1 ¿residence at 2514 Cambronne Street that he shared with his brother and Tasha. He was awakened by what he recalled was four or five shots. He opened the front door to see Tasha lying on the front porch. To open the iron security gate he had to push her body aside a little to squeeze out. He then turned her over. She was unresponsive. Tasha had a purse on her shoulder and a plastic bag from a store with her. She was carrying Hawaiian Punch and had a key in one of her hands. Tony testified that quite a few cars were present on the block that day, and a bicycle was in the alleyway next to his house. He admitted to four prior marijuana convictions: one for first offense possession, two for second offense possession, and one for third offense possession. Tony said he had seen Robinson at their home at 2514 Cambronne Street in the company of Tasha on more than one occasion. The last time was in the month of July. He provided police with Robinson’s name and address. Tony testified that Zay White (“Zay”) (actual name, Zaairvert White) lived three doors down from him. Zay was not outside when Tony first came outside.
 

 On cross examination Tony stated that it took him about 30 seconds to get to the front door after being awakened by the gunshots. He admitted that he had “three felonies.”
 

 New Orleans Police Department (“NOPD”) Homicide Detective Erbin Bush investigated the homicide in question. The victim was pronounced dead at the scene, 2514 Cambronne Street. He said the victim’s positioning on the porch and the evidence surrounding her suggested that she was likely either just arriving home or departing at the time she was killed. Detective Bush recovered a bicycle, but never determined to whom it belonged. Eight spent cartridge casings and
 
 *617
 
 twelve bullet fragments were collected at the crime scene and placed into evidence. |5A black backpack was recovered that had personal belongings in it and a state of Louisiana protective order. Detective Bush interviewed ten-year-old Zay at the NOPD Second Police District station. He presented the youth with a photographic lineup. Zay viewed the lineup for several seconds before selecting a photo. Detective Bush said Zay seemed 100% confident in his choice. The detective also presented Zay’s mother with a photographic lineup, but she could not identify anyone. Detective Bush presented Rounds with the photographic lineup, and she selected one of those depicted.
 

 Detective Bush testified that once he got an identification on the suspect he prepared and had signed arrest and search warrants, respectively, for Robinson and Robinson’s residence. The search warrant was executed. However, Robinson was not at the residence to be arrested. Detective Bush went to Robinson’s residence on a few occasions and spoke to his mother on several other occasions. Robinson was eventually located in the state of Minnesota.
 

 Detective Bush confirmed that he did not know whether or not Tasha had on a backpack or anything at the time she was shot. He said he believed Zay lived to the left of the Smith residence, but was not certain. He confirmed that the eight spent casings found at the scene meant that at least eight shots were fired at some time from somewhere. Detective Bush believed Detective Hilal Rohli talked to Zay and his mother at the scene. He said Rounds was 70% to 80% certain of the photograph she selected. He instructed her to write “Tentative” on the back of the lineup. Rounds did not give him a physical description of the shooter. But someone else he interviewed gave a physical description.
 

 Zay was fourteen years old at the time of trial. He testified that on 29 July 2004 he was living at 2508 Cambronne Street. Tasha was his next door neighbor. [6He said Tasha was shot down by Robinson. Zay had seen Robinson twice before the day he saw him shoot Tasha. Zay said he heard nine shots. He said the gun used by Robinson was a nine-millimeter that he thought was chrome plated. Zay said the weather on the day Tasha was shot was sunny, and he said he got a pretty good look at the person who shot her. The shooter had nothing covering his face. Zay met with Detective Bush at a police station the same night Tasha was shot, where he was shown a photographic lineup. He said he picked someone out, and was positive of his identification. Zay was shown a photographic lineup with his signature on the back, and an indication that he selected photo number one as the person he saw shoot Tasha. Zay pointed out Robinson in court as that person. Zay said he lived to the left of Tasha’s house. He said he had seen Robinson the day before the shooting at a store on the corner of Apple and Leonidas Streets.
 

 Zay said that on the day of the shooting Robinson put a bicycle behind a car, then talked to the father of one of Zay’s friends, who was named Mike. Mike’s father walked away. Robinson then went down Tasha’s alley. Zay said Tasha got out of a white car and walked to her door. He said that as soon as she stuck her key in the door, Robinson jumped out of the alley and yelled: “Surprise.” Zay confirmed on redirect examination that Robinson shot Tasha. He said he was testifying because somebody had to testify, and somebody had to do what was right.
 

 Paul McGarry, M.D., a forensic pathologist with the Orleans Parish Coroner’s Of
 
 *618
 
 fice, was qualified as an expert in the field of forensic pathology. He testified that Tasha, whom he described as a healthy young woman, was five feet two inches tall and weighed eighty-five pounds. Tasha had five gunshot wounds and two clusters of bullet fragment wounds made by bullets fragmenting on |7something and then striking her. Four wounds to the upper torso were all going from the left back, forward. Dr. McGarry recovered four whole bullets and one fragment. He initialed all of the bullets and placed them in envelopes that he then sealed. All of the copper-jacketed bullets were nine-millimeters in diameter. The four wounds to the upper torso would be considered fatal wounds. Three of the wounds, including one that Dr. McGarry described as probably not even treatable, would have caused death within minutes. One of the four fatal wounds might possibly have been treated. The fifth bullet wound was through the right heel, which Dr. McGarry said would not be considered fatal. Further, the two fragment cluster wounds, one to the left upper back and one to the left hip, would not be considered fatal wounds. The cause of death was the effect of multiple bullet wounds causing perforation, disruption of internal organs, and massive hemorrhage.
 

 Dr. McGarry testified on cross examination that the bullets were fired from a distance of more than two feet away. The bullets traveled slightly downward.
 

 Officer Robert Vetsch, of the St. Paul, Minnesota Police Department, testified that on 15 February 2005, he conducted an investigation of a residence at 822 Edmond Street in St. Paul. He first encountered a female, Simone Smith (“Simone”), and later two males, Calvin Poole (“Poole”) and Robinson. When Officer Vetsch entered the living room area, Robinson was sitting on a tan or yellowish leather couch. Initially, Robinson appeared to be laying down. Upon seeing the uniformed officer, Robinson sat up very quickly in a leaning forward fashion and his eyes widened. He appeared to be shifting his weight in a side-to-side manner. Officer Vetsch called in his partner, Officer Tanghe, who was sitting outside in their patrol car. When Officer Tanghe arrived, Officer Vetsch directed RRobinson to get up from the couch. Officer Vetsch performed a protective sweep to determine whether there were any other people in the apartment. Meanwhile, Simone, who had been directed to sit on a chair, had gotten up from the chair and went to sit on the couch where Robinson had originally been seated. Officer Vetsch directed Simone to get off the couch and sit in that chair again. He said she was slow to respond. At that point Officer Vetsch concluded that somebody might be trying to conceal something from him, or that there was something there that someone did not want him to discover. The officer subsequently lifted up the couch cushions. He discovered two loaded handguns under the cushion where Robinson had been sitting and where Simone later sat.
 

 Simone, Poole, and Robinson were then removed from the living room area to prevent them from having immediate access to the handguns. All three were eventually taken to the police station for further investigation. Officer Tanghe remained behind to guard the apartment and the two handguns, which were left where they were found, on the couch. Simone later signed a waiver and consent to search form for her apartment. Officer Vetsch identified a number of photographs of Simone’s apartment, including a close-up photograph of a silver or gray-colored Ruger handgun that was one of the two that were on the couch. In another photograph, Officer Vetsch identified the serial number of the Ruger handgun. The officer also identified Robinson in court as the
 
 *619
 
 person he observed sitting on the couch on top of the handgun that day.
 

 Officer Vetsch admitted on cross examination that when he first went to Simone’s apartment she told him he could not enter. The officer admitted that in fact Simone had pushed him in his chest, apparently in a vain attempt to keep him from entering. Officer Vetsch confirmed that the couch pillows were not up when Neither Robinson was sitting on it or when Simone later sat on it. Officer Vetsch confirmed that at the time he raised the couch cushions Robinson was in the kitchen with Officer Tanghe, approximately 10 to 15 feet away. Simone was seated at the time on a chair in the living room about 10 feet away from the couch. Officer Vetsch said he could have lunged to that couch, obviously meaning from where Robinson and Simone were situated. He said he lifted up the couch cushions because he was concerned by all the suspicious behavior, obviously meaning by Robinson and Simone vis-a-vis the couch, as well as the possibility those two could lunge and reach the sofa. On redirect examination, Officer Vetsch testified that the reason he went into the apartment was because of a very strong smell of burnt marijuana emanating from it. He said he was going to turn over a ten-year-old child back to her mother, apparently referring to Simone. Officer Vetsch testified that the child had been involved in an incident prior to him going to the apartment.
 

 Officer Tom Tanghe, of the St. Paul, Minnesota Police Department, testified that on 15 February 2005 he had occasion to conduct an investigation at 822 Edmond Street. He encountered Robinson, who told him his name was Ferdinand Joseph Robinson. Officer Tanghe later discovered Robinson’s true identity. Officer Tanghe recovered the two handguns using the standard procedure of picking them up with gloves, putting them in paper receptacles, sealing them, turning them into their crime lab locker, and then writing a report documenting what he did. Officer Tanghe said he mistakenly recorded the serial number of one of the handguns- as 803-70258 instead of the correct number of 303-70258. Officer Tanghe also read the serial number, 303T0258, of a second firearm depicted in a | inphotograph.
 
 [2]
 
 The officer conceded that at the point they discovered the guns that they were already in the custody and control of the officers. Officer Tanghe confirmed Officer Vetsch’s testimony about Simone moving from the chair where she had been directed to sit, over to the sofa cushion underneath which the two handguns were discovered. Officer Tanghe indicated that Robinson was five to ten feet away from the sofa cushion, and Simone two to five feet away, before Officer Vetsch lifted it.
 

 Officer Robert Layne Lodmell, of the St. Paul, Minnesota Police Department crime lab, testified that he recovered two handguns from the evidence locker on 16 February 2005. The following day he processed the Ruger P85 nine-millimeter semi-automatic handgun, serial number 303-70258. He recovered no identifiable fingerprints from this gun. Before processing the gun for fingerprints he used three sterile swabs and did DNA swabbing of the gun. He identified the three DNA swabs he used.
 

 Jay Wenner, Ph.D., a forensic scientist for the Minnesota Bureau of Criminal Apprehension, testified that he did DNA comparisons of known DNA samples from Robinson, Poole, the sample collected from
 
 *620
 
 the Ruger P85 nine-millimeter handgun, and a sample collected from the second handgun. He stated that the partial DNA profile from the Ruger handgun matched the DNA profile of Robinson. Wenner testified that the probability of selecting an unrelated individual at random from the general population who would have a DNA profile that would match the DNA profile obtained from the Ruger handgun was approximately one in 83,000.
 

 | iiNOPD Sergeant Byron Wimbush was qualified by the trial court as an expert in the field of firearms identification. He test-fired and examined a nine-millimeter handgun, which he mistakenly described as a “Taurus” brand. He correctly listed the serial number of the gun, 303-70258, which was the serial number of the Ruger handgun discovered by St. Paul, Minnesota Police Officers Vetsch and Tanghe. Sergeant Wimbush testified that the eight cartridge casings that were recovered on the scene of the Cambronne Street shooting were fired from this nine-millimeter handgun, as were “the three” bullets and one copper jacket recovered during the autopsy of the victim.
 

 ERRORS PATENT
 

 A review of the record reveals no errors patent.
 

 ASSIGNMENT OF ERROR NO. 1
 

 In his first assignment of error, Robinson argues that the trial court erred in denying his challenge for cause of potential juror, Margaret Mielke (“Mielke”), given that she stated during
 
 voir dire
 
 that she did not know whether she could be impartial due to the fact that three of her children had been crime victims.
 

 A trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the
 
 voir dire
 
 record as a whole reveals an abuse of discretion.
 
 State v. Campbell,
 
 06-0286, p. 73 (La.5/21/08), 983 So.2d 810, 858,
 
 cert. denied, Campbell v. Louisiana,
 
 — U.S. -, 129 S.Ct. 607, 172 L.Ed.2d 471 (2008);
 
 State v. Leger,
 
 05-0011, p. 66 (La.7/10/06), 936 So.2d 108, 155. Only where it appears, upon review of the
 
 voir dire
 
 examination as a whole, that the trial court’s exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the accused, will an appellate court reverse that ruling. L
 
 12State v. Lee,
 
 93-2810, p. 9 (La.5/23/94), 637 So.2d 102, 108;
 
 State v. Passman, 345
 
 So.2d 874, 880 (La.1977).
 

 In
 
 State v. Juniors,
 
 03-2425, pp. 7-9 (La.6/29/05), 915 So.2d 291, 304-305, the Court stated:
 

 Louisiana Constitution article I, § 17 guarantees to a defendant the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. The number of peremptory challenges granted a defendant in a capital case is fixed by law at twelve. LSA-C.Cr.P. art. 799. When a defendant uses all twelve of his peremptory challenges, an erroneous ruling of a trial court on a challenge for cause that results in depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence.
 
 See State v. Cross,
 
 93-1189, p. 6 (La.6/30/95), 658 So.2d 683, 686;
 
 State v. Bourque,
 
 622 So.2d 198, 225 (La.1993),
 
 overruled on other grounds by State v. Comeaux,
 
 93-2729 (La.7/1/97), 699 So.2d 16. Prejudice is presumed when a challenge for cause is erroneously denied by a trial court and a defendant has exhausted his peremptory challenges.
 
 State v. Robertson,
 
 92-2660, p. 3 (La.1/14/94), 630 So.2d 1278, 1280;
 
 State v. Ross,
 
 623 So.2d 643, 644 (La.1993). Therefore, to establish
 
 *621
 
 reversible error warranting reversal of a conviction and sentence, defendant need only demonstrate (1) the erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges.
 
 Cross,
 
 93-1189 at 6, 658 So.2d at 686;
 
 Bourque,
 
 622 So.2d at 225.
 

 In the instant case, Robinson was tried for second degree murder, an offense necessarily punishable by imprisonment at hard labor. Thus, he had twelve peremptory challenges. La. R.S. 14:30.1; La. C.Cr.P. art. 799. The record reflects that Robinson exhausted all twelve of his peremptory challenges, and in fact used a peremptory challenge to strike Mielke. La.C.Cr.P. art. 797(2) provides that the state or the defendant may challenge a juror for cause on the ground that,
 
 inter alia,
 
 the juror is not impartial, whatever the cause of his partiality. “[A] challenge for | iscause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to law may be reasonably implied.”
 
 Juniors,
 
 03-2425 at p. 9, 915 So.2d at 305.
 

 In the instant case, the prospective jurors were asked by the state during
 
 voir dire
 
 whether any of them had a family member or friend who had been a victim of a crime of violence. Prospective juror Mielke responded:
 

 Well, my son was robbed and pistol-whipped about four years ago, my younger daughter was attempted car-jacked about two years before that, and my oldest daughter was raped at nine o’clock in the morning. I don’t know if I could be impartial.
 

 During the jury challenge process counsel for Robinson sought to challenge Mielke for cause, on the stated ground that “[s]he stated that she couldn’t be impartial under any circumstances.” A prosecutor countered that he did not think Mielke said she wouldn’t be impartial. Counsel for Robinson said that was what he had put down as what she answered to him. We note that defense counsel never asked Mielke any questions at all; she was simply responding to a question by the state’s counsel.
 

 Mielke only stated that she did not know if she could be impartial and did not affirmatively state she could not be. We do not find that Mielke’s responses as a whole revealed facts from which bias, prejudice, or an inability to render judgment according to law might be reasonably implied. Moreover, the ground stated by defense counsel for the challenge for cause, Mielke stated that she could not be impartial under any circumstances, was incorrect. Therefore, we do not find that the trial court abused its discretion in denying Robinson’s challenge for cause as to Mielke.
 

 | tRobinson cites
 
 State v. Holmes,
 
 619 So.2d 761 (La.App. 4th Cir.5/27/93), where this court held that a juror who indicated under intense and thorough questioning that she could not assure defense counsel that the fact that her husband had been held hostage at one point would not affect her in judging the accused. The juror had expressed similar sentiments under questioning by the state and the trial court. Under questioning by the trial court, however, the real issue came out. The accused was being tried for,
 
 inter alia,
 
 aggravated kidnapping. The juror’s husband had been taken hostage. Explaining her reservations, the juror expressly stated: “Kidnapping is why.”
 
 Holmes,
 
 619 So.2d at 763. Thus,
 
 Holmes
 
 is factually distinguishable from the case at bar.
 

 We find no merit to this assignment of error.
 

 
 *622
 

 ASSIGNMENT OF ERROR NO. 2
 

 In his second assignment of error, Robinson argues that the trial court erred in denying his challenge for cause as to potential juror, Danielle Smith (“Danielle”).
 

 During
 
 voir dire
 
 the jurors were responding to the question from the state as to whether any of them had a family member or friend who had been a victim of a crime of violence. Prospective juror Danielle raised her hand and stated that her brother was killed in 1986 and her cousin four or five years previously. She said nothing about being unable to be impartial. Danielle asked the court if she could step up to the bench; a sideboard conference between counsel, the court and Danielle, without the presence of the court reporter, was held. During the conference defense counsel sought to challenge Danielle for cause, stating no specific reason. Because the record does not reflect that Danielle could not be impartial, or that any other ground for a challenge for cause existed, we do not find|1Bthat the trial court abused its discretion in denying Robinson’s challenge for cause as to Danielle.
 

 Robinson argues, however, that because no transcript of the sidebar conference exists, which he submits obviously concerned “whether Ms. Smith could be impartial despite the fact that her family members were crime victims,” he is entitled to a new trial.
 

 La. Const. art. I § 19 guarantees a defendant a right of appeal “based upon a complete record of all the evidence upon which the judgment is based.” Additionally, La.C.Cr.P. art. 843 provides in pertinent part:
 

 In felony cases, ... the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
 

 In State
 
 v. Campbell, supra,
 
 the defendant argued that record omissions during
 
 voir dire
 
 rendered it difficult to establish the viability of challenges for cause. However, the Louisiana Supreme Court stated that with regard to the transcription of the
 
 voir dire
 
 proceedings it found no difficulty in determining the appropriateness of the challenge for cause issues raised by the defendant in his appeal.
 

 In the instant case Danielle simply stated that her brother had been killed over two decades earlier and her cousin some four or five years previously. She said nothing about being unable to be impartial. And defense counsel, who was present at the sidebar conference with Danielle, the court and the state’s counsel, stated no grounds for the record as a basis of his challenge for cause. Considering these facts and circumstances, we have no difficulty in determining that Robinson |lfihas failed to establish that the trial court abused its discretion in denying defense counsel’s challenge for cause of Danielle. Robinson has failed to establish that he was prejudiced by the absence of the sidebar conference transcript.
 

 No merit exists as to this assignment of error.
 

 ASSIGNMENT OF ERROR NO. 3
 

 In his final assignment of error, Robinson argues that the trial court erred in denying his motion to suppress the murder weapon, a handgun, that was seized in St. Paul, Minnesota.
 

 At the 13 September 2007 motion to suppress hearing, St. Paul, Minnesota Police Department Officer Vetsch was the only witness to testify. He stated that on 15 February 2005 he and his partner at
 
 *623
 
 tempted to make a traffic stop of a vehicle. The vehicle sped off and, during a three-block pursuit, reached speeds of 55 to 60 miles per hour. The vehicle came to a stop and the driver fled, but was subsequently apprehended by Officer Vetsch’s partner. Inside the car were two females, one being ten-year-old Letinia Smith (“Le-tinia”). The vehicle turned out to be stolen.
 

 The officers drove to Letinia’s residence, 822 Edmond Street, No. 2, in St. Paul. Letinia told Officer Vetsch to go to the back door. The officer did so and knocked on the door. A female, later identified as Simone, the juvenile’s mother, opened the door. As soon as Simone opened the door, Officer Vetsch recognized a “very, very strong odor” of marijuana. He also said that it appeared from the smoke in the air that someone had possibly just smoked marijuana or was then smoking it within the residence. Officer Vetsch was in a St. Paul police officer’s 117uniform. He identified himself to Simone and explained that he was trying to find the juvenile’s mother.
 

 He said that immediately Simone became very upset and began to yell at him. She demanded that her child be turned over to her immediately. The officer asked her if she had been smoking marijuana, and she admitted she had. Officer Vetsch said that, based on what he had observed, the odor of marijuana, and the actual smoke in the air, he entered the residence. He also said that just prior to his entering the apartment he had also asked Simone if anybody else was inside. She said only one other person was inside, her boyfriend.
 

 After Officer Vetsch entered the apartment he noticed that in fact two other individuals were inside. He said that at that point his senses were alerted and he was concerned because now he had two people to worry about in addition to Simone. As he proceeded to walk forward, the male who at that time was laying on a couch, who was later identified as Robinson, immediately sat up in a very quick and unusually stunned manner. Robinson’s eyes were very obviously enlarged and he had a look of fear and alarm on his face. Office Vetsch said that, based bn his 13 years as a police officer, Robinson’s mannerisms did not appear to be consistent with somebody who was nervous because they were haring an encounter with the police. Rather, Officer Vetsch stated, the man was displaying flight or fight mannerisms and movements.
 

 Officer Vetsch had also observed a silver hatchet sitting on top of a boom box. The officer said he was becoming concerned that he inadvertently had walked into a drug dealing atmosphere. At that point he, who by then had requested his partner’s assistance, asked for identification from the individuals because of Robinson’s behavior. Officer Vetsch testified that because of | |8Robinson’s behavior he was concerned that Robinson might have a weapon in the couch he was sitting on. Officer Vetsch later testified at trial that Robinson appeared to be shifting his weight in a side-to-side manner. Officer Vetsch requested that Robinson get up from the couch and approach his partner so his partner would have better control over him. Simone was asked to sit on a dining room chair. However, after Robinson got up from the couch, Simone immediately went over and sat down on the couch. Officer Vetsch told her twice to get off the couch. Once she was put in a secure location Officer Vetsch pulled up the cushions of the couch, revealing two handguns, one of which was subsequently determined to be the murder weapon in this case.
 

 The guns were not disturbed until they were seized later pursuant to a search conducted under authority of a consent-to-
 
 *624
 
 search form signed by Simone. Officer Vetsch testified at the motion to suppress hearing that Simone was transported to police headquarters for interviewing after the guns were discovered. However, she was returned to her apartment and told that no plans then existed to take her into custody. As previously noted, Simone had already signed a consent to search form, but Officer Vetsch testified that after she was returned to her apartment they went back over it. He said she again agreed to everything on the form and told him that they could look anywhere in the apartment because she had nothing illegal that she was concerned about. Officer Vetsch identified the consent to search form signed by Simone. He replied in the negative when asked if she had been coerced into signing it. He replied in the affirmative when asked if she had signed it freely and voluntarily. The officers seized the two handguns from the couch, and some marijuana was also seized. Officer Vetsch testified at trial that he also made a protective sweep of the apartment to see if any other individuals were present.
 

 | ^Robinson’s argument rests on his assertion that Office Vetsch lacked exigent circumstances to enter the apartment. For its part, the state does not question that Robinson had the standing to challenge the search and seizure, but argues that exigent circumstances were present.
 

 Robinson argues that Officer Vetsch never claimed that any exigent circumstances existed that required him to enter Simone’s apartment; he never claimed to be concerned that drugs might be destroyed if he did not force his way past Simone. Robinson accurately states that Officer Vetsch stated at the motion to suppress hearing that he decided to enter the apartment because he wanted to make an evaluation as to whether he could safely return Simone’s daughter to the residence. However, Officer Vetsch also testified at trial that the reason he went into the apartment was because of the very strong smell of burnt marijuana emanating from it. But he also noted at trial that he was returning a ten-year-old child, who had been involved in an incident. Robinson argues that no reason existed to rush inside the apartment out of concern for the juvenile’s safety, as she was not inside of the apartment, and that police knew they could not leave the child at the apartment because Simone had admitted she had just smoked marijuana. Robinson submits that no need existed for any further evaluation, and that the officers’ recourse was to take the child to protective services.
 

 A warrantless search and seizure fails to meet constitutional requisites unless they fall within one of the narrow exceptions to the warrant requirement.
 
 State v. Edwards,
 
 97-1797, p. 11 (La.7/2/99), 750 So.2d 893, 901. On trial of a motion to suppress, the state has the burden of proving the admissibility of all evidence seized without a warrant. La.C.Cr.P. art. 703 D;
 
 State v. Jones,
 
 97-2217, p. 10 (La.App. 4 Cir. 2/24/99), 731 So.2d 389, 395. A trial court’s ruling on a motion laito suppress the evidence is entitled to great weight, because the court has the opportunity to observe the witnesses and weigh the credibility of their testimony.
 
 State v. Devore,
 
 00-0201, p. 6 (La.App. 4 Cir. 12/13/00), 776 So.2d 597, 600-601;
 
 State v. Mims,
 
 98-2572, p. 3 (La.App. 4 Cir. 9/22/99), 752 So.2d 192, 193-194. In reviewing a trial court’s ruling on a motion to suppress, an appellate court is not limited to evidence adduced at the hearing on the motion to suppress; it may also consider any pertinent evidence given at trial of the case.
 
 State v. Nogess,
 
 98-0670, p. 11 (La.App. 4 Cir. 3/3/99), 729 So.2d 132, 137.
 

 In
 
 State v. Warren,
 
 05-2248 (La.2/22/07), 949 So.2d 1215, the Court set forth the
 
 *625
 
 applicable law on the warrantless entry of a dwelling by police, as follows:
 

 Police generally need a warrant to enter a home, but “warrantless searches will be allowed when police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant.”
 
 United States v. Lenoir,
 
 318 F.3d 725, 730 (7th Cir.2003);
 
 United States v. Marshall,
 
 157 F.3d 477, 481-82 (7th Cir.1998);
 
 United States v. Radka,
 
 904 F.2d 357, 361 (6th Cir.1990). One such circumstance is when the police “reasonably fear[] for the safety of someone inside the premises.”
 
 United States v. Richardson,
 
 208 F.3d 626, 629 (7th Cir.2000). The safety of others is a particular concern when police respond to a report of a crime in progress, and, in such a situation, police judgments regarding warrantless entries “should be afforded an extra degree of deference.”
 
 Reardon v. Wroan,
 
 811 F.2d 1025, 1029 (7th Cir.1987). To justify a warrantless entry, the exigent circumstances must be known to the officers “at the time of the warrantless entry” and cannot be based on evidence discovered during the search.
 
 United States v. Rivera,
 
 248 F.3d 677, 680-81 (7th Cir.),
 
 cert. denied,
 
 534 U.S. 923, 122 S.Ct. 277, 151 L.Ed.2d 203 (2001);
 
 accord United States v. Arch,
 
 7 F.3d 1300, 1304 (7th Cir.1993).
 

 In order to justify a warrantless entry based on exigent circumstances, there must also be probable cause to enter the residence.
 
 United States v. Johnson,
 
 9 F.3d L21506, 509 (6th Cir.1993) (citing
 
 United States v. Sangineto-Miranda,
 
 859 F.2d 1501, 1511 n. 6 (6th Cir.1988));
 
 Steagald v. United States,
 
 451 U.S. 204, 211, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981);
 
 Payton v. New York,
 
 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980);
 
 see also United States v. Rubin,
 
 474 F.2d 262, 268 (3d Cir.1973) (“Probable cause to believe contraband is present is necessary to justify a warrantless seai'ch, but it alone is not sufficient ... Mere probable cause does not provide the exigent circumstances necessary to justify a search without a warrant.”). Probable cause is defined as “reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.”
 
 United States v. Bennett,
 
 905 F.2d 931, 934 (6th Cir.1990). This determination must be made from the totality of the circumstances, based on the objective facts known to the officer at the time.
 
 United States v. Ferguson,
 
 8 F.3d 385, 391-92 (6th Cir.1993). In determining whether sufficient exigent circumstances exist to justify the warrantless entry and search or seizure, the court must “consider the totality of the circumstances and the ‘inherent necessities of the situation at the time.’”
 
 Rohrig,
 
 98 F.3d at 1511 (quoting
 
 Johnson,
 
 9 F.3d at 508) (internal quotation marks omitted). Further, the scope of the intrusion must be circumscribed by the exigencies that justified the warrant-less search.
 
 Mincey v. Arizona, supra.
 

 In
 
 U.S. v. Coles,
 
 437 F.3d 361(3rd Cir.2006), the Federal United States Appellate Court noted examples of exigent circumstances that included, but were not limited to hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others.
 
 United States v. Rohrig,
 
 98 F.3d 1506, 1515 (6th Cir.1996);
 
 U.S. v. Richard,
 
 994 F.2d 244, 247-48 (5th Cir.1993);
 
 Mincey v. Arizona,
 
 437 U.S. 385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978);
 
 see also Rubin,
 
 474 F.2d at 268-69. In these limited situations, the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise
 
 *626
 
 unconstitutional intrusion.
 
 Warden v. Hayden,
 
 387 U.S. 294, 298-99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Exigent circumstances, however, do not meet Fourth Amendment standards if the government deliberately creates them.
 
 United States v. Acosta,
 
 965 F.2d 1248, 1254 (3d Cir.1992); United
 
 States v. Duchi,
 
 906 F.2d 1278, 1284-85 (8th Cir.1990);
 
 United States v. Timberlake,
 
 896 F.2d L22592, 597 (D.C.Cir.1990);
 
 United States v. Thompson,
 
 700 F.2d 944, 950 (5th Cir.1983).
 

 The “ ‘physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed,’ ” and accordingly, warrantless entries are considered presumptively unreasonable.
 
 United States v. Saadeh,
 
 61 F.3d 510, 516 (7th Cir.1995);
 
 Payton v. New York,
 
 445 U.S. 573, 585-86, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), quoting
 
 United States v. United States District Court,
 
 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). The relevant focus is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed or removed before a warrant could be secured. Marshall, 157 F.3d at 482.
 

 Exigent circumstances justify a war-rantless entry, search, or seizure when “police officers, acting on probable cause and in good faith, reasonably believe from the totality of the circumstances that (a) evidence or contraband will imminently be destroyed or (b) the nature of the crime or character of the suspects) pose a risk of danger to the arresting officers or third persons.”
 
 United States v. Kunkler,
 
 679 F.2d 187, 191-192 (9th Cir.1982) (footnote omitted). The government bears the burden of showing specific and articulable facts to justify the finding of exigent circumstances.
 
 LaLonde v. County of Riverside,
 
 204 F.3d 947, 957 (9th Cir.2000) (citing
 
 United States v. Shephard,
 
 21 F.3d 933, 938 (9th Cir.1994)) (quoting
 
 United States v. Driver,
 
 776 F.2d 807, 810 (9th Cir.1985)).
 

 Warren,
 
 05-2248 at pp. 9-12, 949 So.2d at 1224-1225.
 

 In the case at bar, Robinson does not dispute that the police had probable cause to believe that contraband was present in the residence. They obviously did. Officer Vetsch smelled the strong odor of burning marijuana and observed what apparently was marijuana smoke; Simone admitted to the officer that she had smoked marijuana. As for exigent circumstances being that any other marijuana in the residence could be disposed of by Simone or others in the residence, all Robinson argues is that Officer Vetsch did not say this was a factor in his entering l^the residence. We note that Robinson does not argue that an objective belief by Officer Vetsch that marijuana or other contraband in the residence would imminently be destroyed would not have been justified.
 

 The Louisiana Supreme Court recited in
 
 State v. Kalie,
 
 96-2650, p. 3 (La.9/19/97), 699 So.2d 879, 881, that “the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer’s action does not invalidate the action taken so long as the circumstances, viewed objectively, justify that action,” citing
 
 Whren v. U.S.,
 
 517 U.S. 806, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996), quoting
 
 Scott v. U.S.,
 
 436 U.S. 128, 138, 98 S.Ct. 1717, 1723-1724, 56 L.Ed.2d 168 (1978).
 

 Thus, it is essentially irrelevant for purposes of the Fourth Amendment analysis what reason Officer Vetsch gave for entering the residence of Simone, as long as the objective facts justified his action.
 

 
 *627
 
 In
 
 State v. Wallace,
 
 41,837 (La.App. 2 Cir. 1/31/07), 950 So.2d 135, Claiborne Parish Deputy Sheriff Brazzel went to the residence of defendant Kevin Waller and Verna Wallace, armed with an arrest warrant for Waller’s arrest. Accompanying Deputy Brazzel were Haynesville, Louisiana Police Chief Smith and two other officers. Deputy Brazzel knocked on the front door and asked Wallace if Waller was present; Wallace told the deputy that Waller was not there. Meanwhile, Chief Smith went around the back, found Waller exiting the back door of the residence, and arrested him. Chief Smith and another officer then went to the front door. When Ms. Wallace opened the front door, Chief Smith could smell the odor of marijuana smoke and saw other people inside. Chief Smith asked Ms. Wallace if he could come inside, and she gave him permission. Once inside, Chief Smith saw marijuana and cocaine residue in plain sight on a cabinet and arrested |24her for possession of the contraband as well for resisting arrest due to her lying about Waller’s whereabouts when she was queried by Deputy Brazzel.
 

 The trial court in
 
 Wallace
 
 granted the defendant’s motion to suppress, finding that the state did not meet its burden of proving that consent for the search existed. The appellate court granted the state’s application for supervisory writ and reversed, finding that the search was incidental to a lawful arrest and conducted with probable cause and under exigent circumstances. The court denied a rehearing, finding that Chief Smith had probable cause to arrest Ms. Wallace and also probable cause to believe that there was more marijuana inside. The court further found exigent circumstances justifying the entry into the residence; those exigent circumstances were Chief Smith’s detection of the odor of marijuana emanating from inside the residence and his observation of people inside who could hide or destroy the suspected contraband.
 

 In the case at bar, even Robinson does not argue that Officer Vetsch did not lawfully come to Simone’s door with her ten-year-old daughter in tow. The daughter had been taken into custody after the stolen vehicle in which she was riding led police on a brief high-speed chase before coming to a stop. Upon Simone opening the door to Officer Vetsch, he smelled the strong odor of burning marijuana, and in fact could see in the air what he believed was marijuana smoke. Simone admitted she had just smoked marijuana. She also informed Officer Vetsch that her boyfriend was inside. Therefore, upon smelling the marijuana smoke and Simone’s confession that she had just smoked marijuana, Officer Vetsch possessed probable cause to arrest Simone. Because another person in the residence who could have disposed of any more marijuana was present, exigent circumstances were present requiring Officer Vetsch to enter and prevent its ^destruction. Officer Vetsch entered the residence and observed a third individual inside. He observed Robinson acting in a furtive manner and directed him to get up from the sofa so Officer Vetsch’s partner could monitor him. The officer observed Simone act suspiciously, in that she got out of a chair she had been directed to sit in and went to sit on the couch where Robinson had just been directed to vacate. At that point Officer Vetsch, fearing for his and his partner’s safety, properly lifted the couch cushion and discovered the two handguns, including the murder weapon.
 

 No evidence to contradict the testimony by Officer Vetsch exists that the consent to search subsequently given by Simone was anything other than free and voluntary. Robinson does not argue that Simone’s consent to search was not given freely and voluntarily.
 

 
 *628
 
 Considering the totality of the circumstances, the trial court properly denied Robinson’s motion to suppress the evidence.
 

 We find no merit to this assignment of error.
 

 CONCLUSION
 

 For the foregoing reasons, we affirm the conviction and sentence of Randolph Robinson.
 

 AFFIRMED.
 

 BELSOME, J., concurs in the Result.
 

 [1]
 

 . Because the victim and several witnesses in this case have the same last name, for clarity we refer to them by their given name; no disrespect is intended in that regard.
 

 [2]
 

 . Our review of the exhibits introduced in evidence establishes that the officer incorrectly identified the serial number of the second handgun as 303T0258. The correct serial number as reflected in Exhibit G is 25-009144.