MAX N. TOBIAS, JR., Judge.
| jThe defendant, Henry Foster (“Foster”), appeals his convictions and sentences for two counts of simple burglary. Finding no patent errors or merit to the defendant’s single assignment of error, we affirm his convictions and sentences.
Foster was charged by bill of information on 9 June 2010 with two counts of simple burglary of an automobile, violations of La. R.S. 14:62. He pleaded not guilty at his 14 June 2010 arraignment. The trial court denied his motions to suppress the evidence and the statement. Foster twice sought supervisory review of the denial of his motion to suppress the evidence. This court denied both writ applications.[1]
Trial was held before a six-person jury on 16 March 2011, but the jury was unable to reach a verdict on either count, and a mistrial was declared. Subsequently, on that same date, Foster was advised of and waived all his rights, |2and pleaded guilty as charged to both counts pursuant to State v. Crosby, 338 So.2d 584 (La.1976). He waived all delays and was sentenced to twelve years at hard labor on each count, both sentences to be served concurrently. On that same date the state filed a bill of information charging the defendant as a second-felony habitual offender relative to the second count. After being advised of and waiving all his rights, Foster pleaded guilty as charged to being a second-felony habitual offender, whereupon the trial court vacated the sentence originally imposed and resentenced him to twelve years at hard labor. This timely appeal followed.
I.
A.
New Orleans Police Department (“NOPD”) Officer Munish Tanewar was patrolling at around 3:00 a.m. on Friday, 23 April 2010, near the intersection of Bar-onne and Foucher Streets in New Orleans, when he observed Foster. Foster was bleeding from his right arm and was carrying a tool box, a “flat case,” and one or more other items. Officer Tanewar and his partner, Officer Anthony Stovall, stopped him to see why he was bleeding and if he needed assistance. Foster informed Officer Tanewar that he had been in an altercation with two black males “around the corner.” He described Foster as nervous, and the officers asked to see his identification. At that time defendant produced a wallet. He also had a second wallet in his hand that he handed over. Officer Tanewar testified that the second wallet had an insurance card sticking out from it bearing the address 1930 General Taylor Street.
When the officers asked Foster who lived at the address, he replied that the wallet belonged to his wife and that he did not know who the person (presumably the one whose name was listed on the insurance card) was. Officer Tanewar stated Isthat the police had been getting complaints of automobile burglaries in the area, so they detained Foster and relocated to 1930 General Taylor Street. At that location Officer Tanewar observed an Infinity automobile with the right-side passenger window half-way down. The inside of the vehicle appeared to have been ran *312 sacked. The officers knocked on the door of 1930 General Taylor, and the owner appeared. The owner stated that he had left his window half-way down, but with the door locked. He further stated that had not given anyone permission to enter his vehicle, and that the wallet with the insurance card had been placed inside the glove box. The victim’s name was on the insurance card that had been inside the wallet found in the defendant’s possession. The officers then advised Foster of his Miranda rights.
Officer Tanewar testified that the tool box Foster was carrying had some broken glass on it. He contacted another officer who canvassed the area, locating a pickup truck in the 4000 block of Baronne Street with its right side rear window smashed. The officers knocked on the front door of the owner’s residence, and he appeared and observed that the vehicle was damaged and had been ransacked. The owner said he had placed the toolbox and a set of jumper cables on the back seat of the truck. These items were in the possession of Foster when Officer Tanewar and his partner first saw him.
On cross examination Officer Tanewar confirmed that he never found any witnesses who had observed Foster break into either of the vehicles, and that he had not been responding to any calls or complaints that evening. He had no descriptions or calls of anyone matching Foster’s description breaking into the vehicles. The officer confirmed that at the time Foster was walking down the street he was not engaged in any criminal activity. He further confirmed that in his |4report he stated that he elected to conduct a suspicious person stop. Officer Tanewar also confirmed that upon being stopped, Foster told them he did not need any medical attention. He also testified that before he asked the defendant for his identification he asked him why he was bleeding from his arm, and that he stated he had been in a physical altercation with two males and that as they drove off in their vehicle he grabbed the tools from the back of their truck. That is the point when he asked Foster for his identification. Foster first produced his own wallet, after which he retrieved from his back pocket the other wallet that had the exposed insurance card. Officer Tanewar stated that he could see “1930 General” on the card, but he could not read the rest of the address.
The officers did not place Foster in handcuffs when they put him in the back of the police car to transport him to 1930 General Taylor Street. However, Officer Tanewar confirmed that Foster could not have gotten out of the police car if he had wanted to, and that he was not free to leave at that time. Officer Tanewar confirmed that the Crime Lab was called out and that they dusted for fingerprints but were unable to find any. Foster was advised of his rights and placed in handcuffs before the officers went to the Baronne Street location of the other vehicle burglary. The officer recalled that the owner of the second vehicle, the pickup truck, stated that his truck was locked and secure at 9:00 p.m. the prior evening. The Crime Lab did not find any fingerprints at that scene either.
On redirect examination Officer Tane-war stated that the location where they first observed Foster was two blocks away from the General Taylor Street vehicle burglary and four blocks away from the Baronne Street vehicle burglary. He confirmed that when he first detained Foster, he felt that to take him two blocks ^around the corner would have quickly dispelled or confirmed any suspicious activity.
NOPD Officer Francis Jarrott took a statement from Foster on 23 April 2010 after advising him of his rights. He re *313 peated the story he had given the arresting officers — he was attacked by two unknown males and that during the course of fending off the attack he received an injury to his right hand and gained possession of the toolbox.
B.
At trial, Officer Tanewar testified again that the officers stopped to check on Foster’s health status because he was bleeding; Foster was carrying a toolbox and jumper cables, and the officer noticed that the toolbox had what appeared to be broken motor vehicle glass on it. Foster had explained that he had grabbed the items from a truck in which his attackers were driving off. Officer Tanewar testified that when the defendant produced his wallet to show some identification, he also produced another wallet that had a piece of paper sticking out. He also stated that the insurance card had an address of 1980 General Taylor written on it, and that Foster claimed the wallet containing the card belonged to his mother. The officer stated that he asked Foster why he was carrying his mother’s wallet, he started to mumble words and that he did not know what the defendant was talking about. These things led the officers to believe Foster may have committed a crime. Officer Tanewar testified that the officers “detained him just to figure out, you know, what was really going on.”
Officer Tanewar and his partner transported Foster to 1980 General Taylor, approximately four blocks away (contradicting the distance he had testified to at the motion to suppress hearing) from where they had first encountered him, where | r,they observed a vehicle matching the vehicle listed on an insurance card contained in the wallet. The officers gave the owner back the wallet Foster had had in his possession, and then relocated to the 4000 block of Baronne Street, approximately two blocks away (contradicting the distance he had testified to at trial — four blocks) from where they first encountered the defendant. There, they observed a white pickup truck with a right rear window smashed. The window had the same type glass that had been on the toolbox. The owner of the vehicle identified the property in Foster’s possession as his. Officer Tanewar confirmed on cross examination that when he first saw Foster he did not see the second wallet, apparently referring to the one with the insurance card in it.
Officer Tanewar admitted on cross examination, after being shown one of his police reports prepared in the matter, that he had indicated “no injury” in the section of the report inquiring if the arrested individual had any injuries. Officer Tanewar confirmed that his superior had told him about burglary complaints in the area where Foster was first seen, and that the officers needed to patrol that area. He admitted that they were not responding to complaints of anyone matching Foster’s description breaking into any cars. Officer Tanewar confirmed on cross examination that he stopped Foster because he could see blood dripping down his arm. He further admitted that it turned into a suspicious person stop, but denied that Foster dropped the items he was carrying and ran. Officer Tanewar testified on redirect examination that his two police reports depicted a cut on Foster’s right elbow.
NOPD Officer Anthony Stovall was partnered with Officer Tanewar at the time they stopped Foster at approximately 3:00 a.m. Foster had blood trickling down his right arm, and he was in possession of several items — an orange case and |7a yellow and black case, a pack with jumper cables in it, and a can. He identified a *314 photograph of the items. He testified that the area in which he and Officer Tanewar were patrolling had been experiencing a high rate of burglaries. When the officers stopped Foster to ask if he was okay, Foster was sweating profusely. Foster told the officers about the alleged fight, but could not say where it happened, only that it had been around the corner. He said two guys jumped out of a truck and he started fighting with them. He also said he took the items off the truck.
Officer Stovall stated that they asked Foster if he had any identification. He said Foster pulled out a wallet but exclaimed: “Oh, no, that’s not my wallet.” Officer Stovall said he told the defendant to “Give it here.” On subsequent cross examination, Officer Stovall testified that when asked for identification Foster pulled out a wallet, but exclaimed: “Oh, this is not — .” At that point (according to his testimony on cross examination) Officer Stovall said, “No, give me that.” Foster then pulled another wallet from his pocket. The first wallet had a zipper and a piece of paper sticking out that had an address of 1930 General Taylor Street. Officer Sto-vall asked Foster if he lived at that address, and he replied in the negative, stating that it was his wife’s wallet. Officer Stovall asked Foster the name of his wife, and he replied that he did not know why he had to tell the officer his wife’s name. Officer Stovall subsequently testified on cross examination that Foster refused to tell them the name of his wife. That prompted the officers to go to the General Taylor Street address.
Officer Stovall confirmed that during his investigation he ascertained that Foster did not reside at 1930 General Taylor and that he had never been inside the residence. The vehicle listed on the insurance card in the wallet had been [^ransacked, with papers spread on the floor and the seat. They went to the nearby Baronne Street location where a truck with a broken window had been located because Foster had in his possession items that had not been in the vehicle burglarized on General Taylor Street. The truck was found with its rear window smashed out. The orange toolbox Foster had been carrying when he was first seen by the officers had broken glass on it. Officer Stovall confirmed on cross examination that before the officers stopped Foster he could see blood trickling down the defendant’s arm. He admitted that they stopped Foster because of that and because he was sweating profusely. Officer Stovall also confirmed that Foster was not stopped solely because of concern for his health but also because he looked suspicious. They were in a marked police unit and were in full uniform. The officer confirmed that Foster did not run, but stood there holding the toolbox with glass on it.
NOPD Sergeant Nicole Barbe testified that on 23 April 2010 she was assigned to the Second District Night Watch, and supervised the investigation of Foster. Sergeant Barbe stated that police were having a problem with automobile burglaries in that area, and so had assigned a two-man unit to patrol the area looking for suspicious activity. She met Officers Tanewar and Stovall near the intersection of Foucher and Baronne Streets and subsequently drove around the neighborhood looking for vehicles that might have been burglarized. She found a white pickup truck in the 4000 block of Baronne Street with a smashed out window. The heavily-tinted auto glass matched the broken glass that was on the toolbox in the defendant’s possession.
Sergeant Barbe testified on cross examination that when she first arrived on the scene, Foster was bleeding. He was not in a police car, but the sergeant did not I «recall whether Foster had been hand *315 cuffed. When she discovered the white pickup truck with the broken glass, she checked the license plate to get the address of the owner and rang the doorbell until the owner came to the door.
Brook Fabacher, the owner of the white pickup truck, testified identifying his property stolen from his truck. He identified crime scene photos of the scene. He stated that he did not know of Foster prior to that morning in the aftermath of the break-in, and he did not give Foster permission to enter his truck and remove anything therefrom.
Orleans Parish Sheriffs Office Sergeant Harry Henry identified an arrest register for Foster dated 28 April 2010, reflecting Foster was booked with simple burglary and possession of stolen things.
II.
A review of the record reveals no errors patent on the face of the record.
III.
In his sole assignment of error, Foster argues that the trial court erred in denying his motion to suppress the evidence.
Warrantless searches and seizures fail to meet constitutional requirements unless they fall within one of the narrow exceptions to the warrant requirement. State v. Edwards, 97-1797, p. 11 (La.7/2/99), 750 So.2d 893, 901; State v. Brown, 09-0722, p. 8 (La.App. 4 Cir. 2/10/10), 32 So.3d 939, 945. At trial of a motion to suppress, the state has the burden of proving the admissibility of all evidence seized without a warrant. La. C.Cr.P. art. 703 D; State v. Jackson, 08-0286, p. 5 (La.App. 4 Cir. 4/29/09), 11 So.3d 524, 529; State v. Robinson, 08-0652, p. 19 (La.App. 4 Cir. 5/13/09), 11 So.3d 613, 624. A trial court’s ruling on a motion to suppress the evidence is entitled to great weight, given that the court has the | ^opportunity to observe the witnesses and weigh their credibility. Robinson, 08-0652, pp. 19-20, 11 So.3d 613, 624; State v. Neville, 08-0014, pp. 6-7 (La.App. 4 Cir. 6/4/08), 986 So.2d 884, 888. A trial court’s ruling on a motion to suppress the evidence will not be disturbed absent an abuse of discretion. State v. Ratliff, 12-1616 (La.10/26/12), 99 So.3d 51, citing State v. Montejo, 06-1807, p. 21 (La.5/11/10), 40 So.3d 952, 967. When reviewing a trial court’s ruling on a motion to suppress, an appellate court is not limited to evidence adduced at the hearing on the motion to suppress; it may also consider pertinent evidence given at trial of the case. Robinson, supra; State v. Craft, 03-1852, p. 5 (La.App. 4 Cir. 3/10/04), 870 So.2d 359, 363.
The Fourth Amendment of the United States Constitution and La. Const. Art. I, § 5 protect persons from unreasonable searches and seizures. In State v. Martin, 11-0082, p. 5 (La.10/25/11), 79 So.3d 951, 955, the Court discussed when a “seizure” occurs, for constitutional purposes, as follows:
Federal jurisprudence has concluded that a “seizure” occurs “[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.” Id. This court has held, “[u]nder Louisiana’s slightly broader definition of the term, a seizure may also occur ‘when the police come upon an individual with such force that, regardless of the individual’s attempt to flee or elude the encounter, an actual stop of the individual is virtually certain [to occur].’ ” State v. Sylvester, 2001-0607, p. 3 (La.9/20/02); 826 So.2d 1106, 1108, quoting State v. Tucker, 626 So.2d 707, 712 (La.1993).
Police may briefly detain an individual in a public place whom they reason *316 ably suspect has committed, is committing, or is about to commit an offense, and demand of him his name, address, and an explanation of his actions. La.C.Cr.P. art. 215.1; Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Dobard, 01-2629, p. 3 (La.6/21/02), 824 So.2d 1127, 1129-30. “Reasonable suspicion” is something less |nthan probable cause, and the reviewing court must look to the facts and circumstances of each case to determine whether the detaining officer had sufficient facts within his knowledge to justify an infringement of the individual’s right to be free from governmental interference. State v. Denson, 11-0517, p. 4 (La.App. 4 Cir. 1/25/12), 83 So.3d 1183, 1187, writ denied, 12-0391 (La.6/22/12), 91 So.3d 967. The totality of the circumstances must be considered when determining whether reasonable suspicion exists. State v. Morgan, 09-2352, p. 5 (La.3/15/11), 59 So.3d 403, 406; Denson, 11-0517, p. 5, 83 So.3d at 1187, citing State v. Belton, 441 So.2d 1195, 1198 (La.1983). While mere suspicious activity is not a sufficient basis for police interference with an individual’s freedom, police do not have to observe what they know to be criminal behavior before making an investigative stop. State v. Juengain, 09-0425, pp. 5-6 (La.App. 4 Cir. 1/20/10), 41 So.3d 499, 503-04.
The fact that a police officer does not have the state of mind which is hy-pothecated by the reasons which provide the legal justification for the officer’s action does not invalidate the action taken so long as the circumstances, viewed objectively, justify that action. State v. Kalie, 96-2650 (La.9/19/97), 699 So.2d 879, 881.
Police officers also have the right to approach and engage anyone in conversation, even without reasonable suspicion to believe they have committed, are committing, or are about to commit a crime. State v. Guillory, 09-1350, p. 3 n. 3 (La.11/20/09), 21 So.3d 945, 947 n. 3. As long as the individual approached remains free to disregard the encounter and walk away, the encounter does not implicate the constitutional provisions barring unreasonable searches and seizures. Dobard, 012629, p. 3, 824 So.2d at 1130. Moreover, police may request some | ^identification from the individual they are conversing with without turning the encounter into a forcible detention, “unless the request is accompanied by an unmistakable show of authority indicating to the person that he or she is not free to leave.” Martin, 11-0082, pp. 7-8, 79 So.3d at 956, quoting State v. Sherman, 05-0779, p. 7 (La.4/4/06), 931 So.2d 286, 291.
According to Officer Tanewar, who testified at both the motion to suppress hearing and at trial, the officers stopped to inquire about Foster’s bleeding arm. He also confirmed that in his police report he wrote that he elected to conduct a suspicious person stop — although it was not clear whether he meant initially — prior to actually stopping the police unit, exiting, and conversing with Foster — or at some point after asking him about his arm. Foster declined medical attention and explained his bleeding arm by stating that he had been in a physical altercation with two males and that as they drove off in their vehicle he grabbed the tools from the back of their truck. It was at that point the officers asked Foster for identification, whereupon, according to Officer Tanewar, Foster first pulled out his own wallet and subsequently another wallet that had an insurance card sticking out of it with an address of 1930 General Taylor Street on it.
When the officers asked Foster who lived at the address, he replied that the wallet belonged to his wife and that he did not know who the person (presumably the *317 one whose name was listed on the insurance card) was. Officer Tanewar testified that they had been getting complaints of automobile burglaries in the area. He also noted later in his testimony that the toolbox Foster was carrying had what appeared to be pieces of broken automobile glass on it. The officer said at that point they detained Foster and relocated him to 1930 General Taylor Street, which was either two or four blocks away, to resolve the matter. Foster was not 1 ^handcuffed, but he was placed in the police unit and transported by the officers to General Taylor Street. Officer Tanewar confirmed that Foster was not free to leave when he was in the police car.
Officer Stovall did not testify at the motion to suppress hearing but did at trial. He testified that the officers stopped Foster to inquire about his bleeding arm, but said they also stopped him because he was sweating profusely and was a suspicious person. Officer Stovall said that when Foster was asked for identification he first pulled out the wallet with a piece of paper sticking out of it with the 1930 General Taylor Street address on it, but then exclaimed that it was not his. Officer Stovall said: “Give it here.” Foster then pulled out his own wallet. Officer Stovall testified that when Foster stated that the wallet with the insurance card (the evidence suggests that the “piece of paper” was, in fact, an insurance card) bearing the 1930 General Taylor Street address belonged to his wife, but could not or would not state the name of his wife, the officers decided to relocate to 1930 General Taylor Street.
Both officers testified to the effect that the area they were patrolling, when they encountered Foster at 3:00 a.m. had been experiencing a higher than normal number of burglaries. Their supervisor that evening, Sergeant Barbe, testified that police were having a problem with automobile burglaries in that area, and so she had assigned a two-man unit to patrol the area looking for suspicious activity.
Objectively, the officers had the right to stop their unit, exit, and inquire into Foster’s physical condition insofar as his bleeding arm. They also had a right to request identification from him. At no time prior to this point could it be said that the two officers, by means of physical force or show of authority, had in some way restrained the Foster’s liberty. Neither could it be said that the officers had come | uupon Foster with such force that, regardless of his attempt to flee or elude the encounter, an actual stop was virtually certain to occur. Thus, no seizure had occurred up to and including the point at which the officers asked Foster for some identification.
Officer Stovall testified that after being requested for identification Foster pulled out a wallet, and then exclaimed: “Oh, no, that’s not my wallet.” He said he told defendant to “Give it here.” On subsequent cross examination, Officer Stovall testified that when asked for identification Foster pulled out a wallet, but exclaimed: “Oh, this is not — .” At that point (according to his testimony on cross examination) Officer Stovall said: “No, give me that.” Foster then pulled another wallet from his pocket. The first wallet had a zipper, and it had the insurance card.
Foster argues that when Officer Stovall directed him to give him the first wallet, the one that turned out to have the insurance card, he thereby asserted authority over him. He argues that he submitted to that authority and thereby was actually seized by police at that point.
However, it was 3:00 a.m. The officers were patrolling the neighborhood specifically to address a problem with recent automobile burglaries. Foster was carry *318 ing several items, including automobile jumper cables and a toolbox with what appeared to be broken automobile glass on it. His right arm was bleeding from an injury he said he sustained in an altercation he had just had with two males at a location he did not recall. He said he had pulled the items in his possession from a truck occupied by the two males as they drove off after the altercation. When asked for identification, he pulled out a wallet but suddenly exclaimed “Oh, no, that’s not my wallet.”
1 ^Foster likens the circumstances of his case to those in State v. Daniels, 93-1769 (La.App. 4 Cir. 1/27/94), 631 So.2d 1281, where this court reversed a trial court’s denial of the accused’s motion to suppress the evidence. However, we distinguish Daniels on its facts. There, two police officers were traveling in a marked police unit in a New Orleans housing project at approximately 7:00 a.m. when they observed Daniels walking a small bicycle and carrying a bicycle tire pump on his shoulder. Daniels crossed the street in front of the officers’ vehicle, acting nervously in doing so, looking back over his shoulder at the police car. The officers alighted from their vehicle, and one told Daniels to approach the police car. Daniels dropped the bicycle at his feet and complied, whereupon an officer immediately frisked him and discovered a pistol. He was arrested for possession of a firearm by a convicted felon. The trial court denied Daniels’ motion to suppress the evidence and he was tried and convicted.
The defendant in Daniels argued on appeal that the trial court had erred in denying his motion to suppress and we agreed. One officer testified at trial that there had been complaints of stolen bicycles in the housing project, but no specific report of any stolen bicycle, particularly of one fitting the description of the one being walked by Daniels. This officer admitted that the only support for the stop was the small size of the bicycle and Daniels’ nervous gesture. We noted that Daniels was also carrying a bicycle pump, reasoning that it was not reasonable to assume that a person walking a bicycle and carrying a pump was a thief. We stated that the mere fact that the incident occurred in a housing project did not in and of itself give rise to an inference of criminality — even while acknowledging that housing projects were known to be high crime areas.
11fiIn the instant case, unlike in Daniels, Foster’s actions after the police lawfully encountered him and asked for his identification (pulling out a wallet that did not belong to him and exclaiming that it was not his) caused the encounter to ripen into reasonable suspicion, in view of the totality of the circumstances.
Foster also cites State v. Martin, supra, where the Court reinstated the trial court’s ruling denying the defendant’s motion to suppress the evidence, after the court of appeal had reversed the trial court. The circumstances in Martin were that a deputy sheriff encountered Martin, someone he knew and whom he knew had been in “some trouble,” while outside a convenience store. The deputy asked Martin how he was doing and then asked for some identification to check for outstanding warrants. The deputy noticed that Martin was nervous and sweating profusely, unusual behavior hot characteristic of their previous encounters at football games and other civic functions when they would joke around. WTiile retaining Martin’s identification, and based on his observations of behavior, the deputy asked Martin if he had anything illegal on him. Martin responded that he had four Soma pills in his pocket, whereupon the deputy placed him under arrest for possession of a controlled dangerous substance.
*319 The trial court in Martin denied his motion to suppress the evidence. The court of appeal reversed.[2] The dispositive issue was whether Martin had been seized for Fourth Amendment purposes when the deputy retained his identification while he conducted a warrant check. The Court ultimately held that the totality of |17the circumstances failed to show that there was an unmistakable show of official authority by the deputy that would have indicated to a reasonable person he was not free to leave. The Court found that Martin had voluntarily complied with the deputy’s request for identification and voluntarily offered a response to the deputy’s potentially incriminating question, and that under the totality of the circumstances the brief retention of Martin’s identification did not change the nature of the essentially consensual encounter into a seizure.
In the instant case, one cannot reasonably dispute that Foster was seized when he was placed in the back of the police unit and transported two or four blocks away to 1980 General Taylor Street to investigate why he was in possession of a wallet with an automobile insurance card with that address on it.
However, even assuming for the sake of argument that Officer Stovall’s action in directing Foster to give him the wallet with the insurance card constituted a seizure for purposes of an investigatory stop, considering the totality of circumstances and the inferences the officers could draw therefrom, we do not find that the trial court abused its discretion in concluding that at that point the officers had reasonable suspicion to believe that defendant had committed, was about to commit, or had committed an offense.[3]
We find no merit to this assignment of error.
IV.
For the foregoing reasons, we affirm Foster’s convictions and sentences.
AFFIRMED.

. State v. Foster, 10-1574, unpub. (La.App. 4 Cir. 12/7/10), writ denied, State ex rel. Foster v. State, 11-0074 (La.12/16/11), 76 So.3d 1195; State v. Foster, 11-0039, unpub. (La.App. 4 Cir. 1/31/11).

. State v. Martin, 10-0588 (La.App. 3 Cir. 12/8/10), 54 So.3d 111.

. We note that Foster does not argue anything to the effect that the officers’ transportation of him several blocks to 1930 General Taylor Street to resolve their suspicions, one way or the other, constituted an unlawful arrest.